## In re GEORGE JACOBS.

### No. 559.   Opinion Filed November 23, 1910.

#### (111 Pac. 815.)

1.    BAIL—Excessive Bail. The mere fact that a defendant cannot make bond in a certain sum does not necessarily make such sum excessive. Regard must be had to the nature of the crime alleged to have been committed, and the character of the testimony by which it is supported.

2.    BAIL—Right to Reduction—Evidence. For evidence upon which a defendant was not entitled to reduction of bail upon the ground that further confinement would endanger his life, see testimony in this case.

(Syllabus by the Court.)

Application of George Jacobs for reduction of bail.    Denied.

See, also, 3 Okla. Cr. 552, 106 Pac. 977.

The petitioner offered the following affidavits:

"In the District Court of the Fourteenth Judicial District of the State of Oklahoma, in and for McClain County.    State of Oklahoma v. George Jacobs.    Charged with murder.    George Jacobs, being first duly sworn upon his oath, deposes and says:    I am the defendant in the above-entitled cause, I am at the present time confined in the county jail of Cleveland county, Oklahoma, at Norman, charged with the crime of murder.    I was placed in jail on the 9th day of November, 1909, and have continuously been in jail since said time.    At the time of my arrest and incarceration I was in good health, and weighed 157 pounds    My health continued fairly good until about six weeks ago, when the hot weather commenced, at which time I was taken with fever and my blood became very badly infected, so much so that I broke out with boils which have eaten large holes into my body.    I have lost in weight until I now weigh only about 115 lbs., and I am losing flesh and strength daily.    I have been compelled to employ a doctor in order to try and protect my health, and save my life.    I believe a continued confinement in jail will result in the permanent impairment of my health, if not in my death.    Prior to my arrest and imprisonment, I had always led an active life.    For many years I

was engaged in the railroad business and was section foreman. George Jacobs.

"Signed, subscribed and sworn to before me, this the 6th day of August, 1910. F. O. Miller, Clerk District Court. [Seal.]"

"In the District Court of the Fourteenth Judicial District of the State of Oklahoma, in and for McClain County. State of Oklahoma v. George Jacobs. Affidavit of Dr. C. S. Bobo. Dr. C. S. Bobo, being first duly sworn upon his oath, deposes and says: My name is C. S. Bobo. . I am a practicing physicion and reside at Norman, Oklahoma. I am acquainted with George Jacobs, now confined in the county jail, in Cleveland county, Oklahoma, at Norman, on a charge of murder. I have been called to treat him within the recent past professionally, and found him suffering from septic fever due to suppuration of left inguinal gland. His physical condition at this time is such that a continued confinement in jail, in my judgment, will seriously imperil his health, if in fact it will not cause his death. C. S. Bobo.

"Signed, subscribed and sworn to before me, this 6th day of August, A. D. 1910. F. O. Miller, Clerk District Court. [Seal.]"

"In the District Court of the Fourteenth Judicial District of the State of Oklahoma, in and for McClain County. State of Oklahoma v. George Jacobs. Affidavit of W. D. Maxey. W. D. Maxey, being first duly sworn upon his oath deposes and says: That he is the jailer of Cleveland county, Oklahoma, at Norman; that as such jailer he has in his charge and under his control George Jacobs, charged with murder, of McClain county; that the said George Jacobs has been confined in jail now nearly nine months at Norman; that his health was fairly good until the opening of the hot season in the early summer of 1910, when he commenced to lose flesh and strength; that for the past several weeks the condition of his health has been such that as jailer I was compelled to remove him from the jail proper where the prisoners are confined, to a room in the front of the jail building, where he could have better attention. He has been unable to eat and has steadily lost in flesh and strength; and, in addition to this, his blood has been so poisoned that he has broken out with boils which have eaten into his flesh. His condition became so serious I was compelled to call Dr. C. S. Bobo, who has given him medical attention. In my judgment continued confinement of Jacobs during this hot weather will result in the permanent impairment of his health, if not in his death. During all the time he has been con-

fined in jail, he has been an exemplary prisoner, never giving the least trouble in any way, and always being ready and willing to assist the officers in maintaining order in keeping down distur- bances. W. D. Maxey.

"Signed, subscribed and sworn to before me, this 6th day of August, 1910. F. O. Miller, Clerk District Court. [Seal.]"

The state placed Dr. W. C. McCurd on the stand, who testi- fied as follows:

Direct examination by Mr. Carr:

"Q. Where do you live? A. Purcell. Q. What is your business? A. Physician. Q. Are you a regular licensed and practicing phy- sician? A. Yes, sir. Q. Graduate of any school? A. Yes, sir. Q. What? A. Texas State University. Q. What year? A. 1903. Q. How long have you been practicing medicine in Purcell? A. About five years; five or six. Q. I will ask you if you were called upon by Mr. Ben Franklin, the county attorney of McClain county, to make a physicial examination of one George Jacobs who is confined in jail at Norman? A. Yes, sir. Q. Did you go to Norman and make that examination? A. Yes, sir. Q. State to the court what was the physical condition of Mr. Jacobs as you found upon your examination; make that as full as you can, just whatever you saw. A. I examined Mr. Jacobs yesterday afternoon about 4 o'clock. I first got a history of his trouble since going to jail. Q. Who from? A. From himself. Q. What did he state? A. He gave a history of the carbuncle on his left thigh. Judge Furman: Where? A. On his left thigh; on the fleshy part of the leg. By Mr. Carr: Q. Where is the inguinal gland? A. In the groin. Q. And the infection came from this? A. Yes, sir, from the carbuncle. That was something like six weeks ago, and the wound has healed practically, and has had none since; only one carbuncle. Though about two weeks ago he had a little attack of bilious fever, which lasted four or five days. Outside of that he gave a history of nothing except constipation and lost appetite on the physical examination. Mr. Patterson: We object as to his giving a general statement as to the history given him by the de- fendant. If the state desires to offer the statements of the de- fendant we urge that the witness be required to give those state- ments, and not only make general statements as to what the his- tory was. Judge Furman: Your objection is this: That the witness should state what the defendant stated? Mr. Patterson:

Yes, sir. By Mr. Carr: Q. Just state what the defendant stated to you. A. Well, he told me that he had a carbuncle and showed me the wound. He took down his pants and underclothing, and showed me the wound he had about six weeks ago. Also he had an attack of fever which lasted three or four days; that was about two weeks ago. Q. Did he say what kind of fever it was, or how it affected him? A. He said it was possibly bilious malaria; lasted three or four days. Q. Did he say whether or not he had a physician called in to wait on him on that occasion? A. I think Dr. Bobo saw him that time, I know he did when he treated the carbuncle. Q. State what further he said, if anything. A. That was the symptoms he complained of. Then I proceeded to make a physicial examination. Q. Did he undress? A. I had him remove his jumper and overalls. Q. Did you make a physical examination of him? A. Yes, sir. Q. State what his condition was? A. I found his pulse normal; about 68. Temperature normal, 68. Respiration was normal. Q. What was it? A. About 16 or 18. Q. Did you find him suffering from any functional troubles of any character whatever, Doctor- A. No, sir. Q. Would you pronounce him a sick man or well man from your examination? A. Well, he was a well man yesterday. Stated that he felt well. On examination I found him to be well. Q. State the surroundings under which you were placed there, whether they were sanitary or otherwise; how he was treated there; what you saw? A. He has an outside corner room, two outside windows. Everything is clean, sanitary; conditions almost perfect. Q. Doctor, do you know how long he has been confined in jail there? A. No, sir, I don't. Q. Did you learn from him or from the jailer or any one? A. No, I don't think I asked. Q. What effect if any will solitary confinement have upon a man after say eight or ten months or a year? A. Well, inactivity of course weakens a man to a certain extent. Q. Any man, will it? A. Yes, sir. Q. Whatever his physical condition may have been when he was placed there? A. Yes, sir. Q. State whether or not you found Mr. Jacobs suffering from any disease whatever of an organic order or nature. If he was kept in confinement, would it be liable to end his life or lessen his years? A. Nothing at all. Q. I will ask you, Doctor, if from the examination you made of him and the condition you found him in, if in your opinion it would have any bad effects upon his life between now and the October term of court, if he

was tried in October, so far as the confinement is concerned? A. I don't think so."

Cross-examination by Mr. Patterson:

"Q. When did you begin the practice of medicine? A. About seven years ago. Q. Where did you practice? A. I practiced in Texas. Came to Oklahoma City for about six months. Then to Purcell since, about six years. Q. Have you been practicing alone or have you been associated with another? A. I was alone until a year and a half ago; my partner is with me now. Q. Do you hold any official position; health officer or anything of that kind? A. No, sir. Q. What is the character of your practice? A. General practice. Q. Were you acquainted with Mr. Jacobs before his confinement? A. I was called to see him one night while he was deputy sheriff at Purcell; something like a year ago. Q. Do you know what his weight was at that time? A. Well, I judge it was about 140 or 45. Q. Was there any perceptible difference in the weight which he had prior to his confinement and the time you went to visit him yesterday? A. Yes, sir. Q. What was the difference, did he weigh more or less? A. He weighs less. Q. Approximately how much? A. I judge him to weigh something like ten, thirteen pounds. maybe less. Q. Will not confinement or inactivity cause a man to gain weight rather than to lose under ordinary or normal conditions? A. I don't think so. Q. What effect would it have upon a man's weight under normal conditions to be confined, and without having exercise other than just his ordinary exercise that is given prisoners in confinement in the county jail? A. Well, of course it affects the digestion and affects the secretions. It makes them all more inactive. Q. I had reference particularly to the weight. What effect would it have on their weight, ordinarily? Would it change their weight? Confinement and inactivity of a man under normal conditions would produce what effect upon his weight? A. I suppose that depends a good deal upon the temperament. I have seen some that gained and some that lost. Q. Were you sufficiently acquainted with Mr. George Jacobs prior to his confinement to judge as to his temperament and condition? A. No, sir. Q. If Mr. Jacobs weighed 157 pounds when he entered jail about nine months ago, and he now weighs 115 pounds, a loss of 42 pounds, what in your judgment would produce the loss of so much weight? A. I ascribe the loss I recognized in him to his carbuncle and the infection which accompanied it and the other attack of fever later on. Q. You spoke

in giving a description of your conversation or rather your examination of having seen him about six weeks before. Did you mean to say you had seen him six weeks before that, and his statement had reference to the examination some six weeks before then—this is the first time you have examined him for the purpose of ascertaining his physical condition? A. Except the time I was called about a year ago. Q. Since his arrest? A. Yes, sir. Q. Are you acquainted with Dr. Bobo? A. Yes, sir. Q. What is his age? A. I don't know. Q. Where does he live? A. Norman. Q. You know the extent of his practice, how many years he has been practicing. A. A number of years. He was practicing here when I came; I don't know how long before. Q. He is a physician of good repute, is he not? A. Yes, sir. Q. In examining Mr. Jacobs where did you find him? Was he confined with the other prisoners, or was he separated from them? A. He was separated. Had a private room. Q. Was anybody with you when you made the examination? A. No, sir. Q. How did you gain entrance into his room? A. I had a letter of introduction from Mr. Franklin to the sheriff. Q. The jailer let you in? A. Yes, sir. Q. Did the jailer accompany you and observe the examination? A. No, sir. Q. Was Mr. Maxey present? A. He was in his office. Q. So the examination was made alone? A. Yes, sir. Q. Did anybody accompany you from Purcell? A. No, sir. Q. You didn't request any of the other physicians to accompany you to make the examination? A. No, sir. Q. Did you inform Mr. Jacobs that you were there for the purpose of making an examination for and on behalf of the state? A. Yes, sir, that was my first statement to him. Q. Then it was he told you frankly how he felt about it, and you found those conditions? A. Yes, sir. Q. You are not familiar with his past history except what he has told you? A. No, sir. Q. Know nothing about the conditions prior to the time you made the examination on yesterday? A. No, sir. Q. What, in your judgment, did he weigh yesterday? A. I judge him to weigh about 130 or 135. Q. Was he pale, emaciated or otherwise, was he tall, what size man is he? A. About 5½. Q. What would be the normal weight of a man that height? A. 135 or 140. Q. In the examination, Doctor, did you merely just take his temperature and his pulse, or did you get his respiration? A. Yes, sir. Q. That is the only examination you made, and you base your judgment upon that examination, and upon the statement made by Jacobs at the time? A. I examined all the different organs, liver, spleen,.

and lungs. Q. You made only a superficial examination? A. Certainly. Q. Did you have your instruments with you? A. Yes, sir."

Redirect examination by Mr. Carr:

"Q. Did Mr. Jacobs say anything to you at the time other than what you have stated? A. Yes, sir. Q. What was it? Mr. Patterson: I object to the statement made by the defendant. Judge Furman: He asked what he said. I think we are entitled to the conditions. About his physicial condition? Mr. Carr: Yes, sir. Judge Furman: I think that is competent. By Mr. Carr: Q. What did he say to you about it, if anything? Did you tell him what condition you found him in? A. No, sir; I didn't explain it to him. I just thanked him for his courtesy. Q. Did he say anything about it? A. Well, he says. 'If it ever comes up, remember me.'" (Witness excused.)

Mr. Ben Franklin, being called as a witness on behalf of the state, and being first duly sworn testified as follows:

Direct examination by Mr. Carr:

"Q. What official position do you hold in McClain county? A. County attorney. Q. Have charge of the criminal docket and have the prosecution of criminal cases in that county? A. I have. Q. I will ask you if the case of the State versus George Jacobs, is on your docket? A. Yes, sir. Q. I will ask you when the next term of your court will be held? A. In October. I forget what day. Q. I will ask you if that case is set for trial at that term? A. The docket has not yet been set, but the case will be set when the docket is set. Q. Will the state be ready for trial at that time? A. We have every reason to believe we will. Mr. Patterson: We object to that as a mere conclusion. Judge Furman: We recognize the fact that is a matter of uncertainty." (Witness excused, and no more witnesses called.)

*Pruiett, Taylor & Sniggs* and *Thompson & Patterson,* for petitioner.

*Ben Franklin,* Co. Atty., and *Henry M. Carr,* for the State.

FURMAN, PRESIDING JUDGE (after stating the facts as above). The defendant being indicted for murder applied, on the 18th day of January, 1910, to this court to secure bail pending his trial on this indictment. On the 11th day of March, 1910, this court granted the defendant bail in the sum of $20,000, which was

never given. The defendant now makes application for the reduction in the amount of bail upon the ground that he cannot give bond in the sum of $20,000, and that therefore it is excessive. The mere fact that a defendant cannot make a bond in a certain sum does not necessarily make such amount excessive. Regard must be had to the nature of the crime alleged to have been committed and character of the evidence by which it is supported. As this case is yet to be tried we do not deem it proper to discuss the evidence further than to remark that in the light of the evidence before us we do not feel that we would be justified in granting a reduction in the amount of the bail upon the ground that it is excessive.

The defendant next contends that he is entitled to a reduction of his bond on account of the state of his health, alleging that further confinement would endanger his life.

We have granted bail upon this ground in several cases, but in each case the facts upon which we acted were conceded by the prosecution. But in this case the facts upon which the defendant relies are contested by the state.

From a consideration of the entire testimony introduced, we are of the opinion that the defendant is not entitled to a reduction of bail upon the ground that further confinement will endanger his life.

The application for a reduction of bail is therefore refused.

DOYLE and RICHARDSON, JUDGES, concur.